*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  February 19, 2015                    106254
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                        Respondent,

        v                                MEMORANDUM AND ORDER

TRACI L. BRISKIN,
                        Appellant.
_____

Calendar Date:  January 6, 2015

Before:  Garry, J.P., Egan Jr., Lynch and Clark, JJ.

_____

        Paul J. Connolly, Delmar, for appellant.

        G. Scott Walling, Special Prosecutor, Schenectady, for
respondent.

_____

Egan Jr., J.

        Appeal from a judgment of the County Court of Saratoga
County (Scarano, J.), rendered December 2, 2013, upon a verdict
convicting defendant of the crime of manslaughter in the second
degree and the traffic infraction of driving while ability
impaired.

        Defendant was charged in a five-count indictment with
manslaughter in the second degree, vehicular manslaughter in the
second degree (two counts) and driving while intoxicated (two
counts).  The charges stemmed from a collision that occurred
between two motor vehicles — one operated by defendant and one
operated by the victim — at approximately 7:30 p.m. on November
30, 2012 at the intersection of Jockey Street and State Route 67
in the Town of Charlton, Saratoga County.  Although defendant

provided more than one version of the events leading up to the collision, she testified at trial that, at approximately 6:15 p.m. on the evening in question, she poured herself a "regular" glass of wine — defined by defendant as containing four to six ounces of wine — and began making herself some macaroni and cheese. When defendant sat down to eat, she poured herself a second glass of wine, which she finished at approximately 7:00 p.m.[1] Within 10 minutes of finishing her second glass of wine, defendant got into her white sport utility vehicle (hereinafter SUV) — intending to drive to a friend's house. According to defendant, her purse was on the front passenger seat, her global positioning system (hereinafter GPS) was plugged into the SUV's cigarette lighter and was resting in one of the vehicle's cup holders and a quantity of beer was lodged under the front passenger seat.

At some point after defendant turned onto Jockey Street, which ran in a generally north/south direction, defendant extinguished the cigarette she was smoking and reached into her purse to retrieve a bottle of body spray. In so doing, defendant knocked the GPS unit out of the cup holder and onto the floor at her feet. Although the GPS unit remained on and continued to give audible directions, defendant deemed it advisable to try and retrieve the unit, which she initially attempted to do by pulling on the attached cord. When the cord became dislodged, defendant tried to maneuver the unit with her feet to the point where she would be able to reach down with her hand and pick it up. By her own admission, this process entailed defendant looking down at the floor of her vehicle which, in turn, resulted in only "[s]poradically" keeping her eyes on the road ahead of her. While searching for the errant GPS unit, defendant missed a traffic sign warning of an impending stop sign,[2] failed — despite

----

[1] Defendant told members of the Saratoga County Sheriff's Department on the night of the collision that she consumed two glasses of wine at a restaurant in the Town of Clifton Park, Saratoga County and had not eaten all day.

[2] The accident reconstructionist appearing on behalf of the People testified that this warning sign was located "several

an unobstructed view of traffic on State Route 67, which ran in a generally east/west direction — to see the victim's vehicle approaching the intersection, passed through the stop sign facing her (and controlling the intersection) and struck the driver's side of the victim's vehicle.[3]  According to various members of the Saratoga County Sheriff's Department, defendant — who was observed to have "glassy" eyes, a bit of "trouble" in walking/negotiating the steps into the ambulance and a detectable odor of alcohol on her breath — failed the field sobriety tests administered at the scene, and her blood alcohol content as of 9:28 p.m. measured .11%.[4]

The accident was witnessed by two motorists — Glen Tevendale Jr. and Denise Feulner.  Tevendale testified that shortly after turning north onto Jockey Street on the evening in question, he observed a white SUV — later determined to be operated by defendant — approximately 100 feet in front of him.  As he continued along Jockey Street, Tevendale saw defendant's SUV cross over the double yellow line dividing the northbound and southbound lanes; defendant's vehicle then swerved to the right —

_____

hundred feet" in advance of the intersection.

[3]  When emergency personnel responded to the scene, defendant attempted to blame the victim for the accident, stating, "That son of a bitch hit me."  The accident reconstructionist testified that defendant's initial account, wherein she purportedly stopped at the intersection but — due to the victim's excessive speed — was unable to clear the intersection before his vehicle struck her SUV, was "physically impossible," and defendant acknowledged at trial that it was her SUV that struck the sedan operated by the victim.

[4]  At trial, the People's and defendant's respective experts offered competing views of defendant's blood alcohol content at the time of the crash; defendant's expert estimated defendant's blood alcohol content to be between .04% and .06% at 7:30 p.m., and the People's expert estimated defendant's blood alcohol content to be .14% at that point in time.

crossing over the white fog line on the eastern shoulder of the road — before swerving back to the left and again crossing over the double yellow line.[5]  At this point, Tevendale saw the brake lights flash, and the SUV thereafter returned to its lane of travel.  Tevendale continued behind defendant's SUV as the vehicles crested and started to descend a small hill, at which point Tevendale could see the headlights of two vehicles — one (it would be determined) operated by the victim and the other operated by Feulner — traveling west on State Route 67 as they approached the intersection with Jockey Street.[6]  As Tevendale continued north on Jockey Street, he saw defendant's SUV first pass the warning sign advising motorists of the stop sign ahead and then pass the stop sign itself — entering the intersection and broadsiding the victim's sedan.  Tevendale testified that he never saw defendant hit her brakes before passing through the intersection.

Feulner testified that she was approximately 10 car lengths behind what would prove to be the victim's vehicle — proceeding westbound on State Route 67 — when she observed two sets of headlights on Jockey Street approaching the intersection with State Route 67.  As she watched these vehicles, it appeared to Feulner that the first vehicle — defendant's SUV — was "traveling too quickly" and was not "slowing down at all or going to stop for the stop sign" at the intersection.  In fact, Feulner was so

---

[5]  According to Tevendale, defendant's SUV began swerving approximately 1½ miles before the stop sign at the intersection of Jockey Street and State Route 67, and he saw it swerve three times in the course of 60 to 90 seconds.  On each occasion, approximately one half of the vehicle's width crossed the relevant road markings.

[6]  Tevendale testified that there were "plowed down" farm fields on either side of Jockey Street; hence, there were not any crops to obstruct a motorist's view of westbound traffic on State Route 67.  Feulner offered similar testimony, stating that the surrounding land was "pretty flat" in the vicinity of the intersection and that there was nothing to obstruct her view of the vehicles proceeding northbound on Jockey Street.

concerned that she pulled her vehicle to the side of the road and stopped.  As she did so, defendant's SUV "came right through the intersection" and struck the victim's vehicle.  Feulner testified that defendant's vehicle neither slowed nor stopped as it approached the intersection.  By all accounts, although it was very cold with slight snow flurries on the night of the collision, the roads were clear, dry and free of ice.

The victim ultimately died from the traumatic injuries sustained in the crash.  Following a jury trial, defendant was convicted of manslaughter in the second degree, acquitted of vehicular manslaughter (two counts) and driving while intoxicated (two counts) and convicted of the lesser included offense of driving while ability impaired.  Defendant thereafter was sentenced to, among other things, a prison term of 2½ to 7½ years with respect to the manslaughter conviction.  Defendant's subsequent motion to set aside the manslaughter conviction was denied, and this appeal ensued.[7]

Defendant initially contends that County Court erred in denying — without a hearing — her motion to suppress the results of her breath test.  We disagree.  "A motion seeking suppression of evidence 'must state the ground or grounds of the motion and must contain sworn allegations of fact . . . supporting such grounds'" (People v Desmond, 118 AD3d 1131, 1133 [2014], lv denied 24 NY3d 1002 [2014], quoting CPL 710.60 [1]).  A hearing in this regard is neither "automatic [n]or generally available [simply] for the asking" (People v Desmond, 118 AD3d at 1133 [internal quotation marks and citations omitted]) and, except in circumstances not present here (see CPL 710.60 [3] [b]; 710.20 [3], [6]), the trial court "may summarily deny the motion if the papers do not allege a legal basis for suppression or if the factual allegations do not as a matter of law support any alleged ground" (People v Vanness, 106 AD3d 1265, 1266 [2013], lv denied 22 NY3d 1044 [2013]; see CPL 710.60 [3] [a], [b]).  Here, in support of her suppression motion, defendant tendered the

_____

[7]  This Court granted defendant's motion to stay execution of the judgment of conviction pending appeal and set bail at $75,000 (see CPL 460.50 [1]).

affidavit of her attorney, who merely asserted — upon information and belief — that the deputies in question lacked probable cause to arrest defendant.  This "bare allegation of a lack of probable cause, without any factual support, was insufficient to require a hearing" (People v Vanness, 106 AD3d at 1266; see People v Armstrong, 94 AD3d 1552, 1553 [2012], lv denied 19 NY3d 957 [2012]).

Nor are we persuaded that County Court erred in granting the People's challenge for cause as to prospective juror No. 9. Pursuant to CPL 270.20 (1) (b), a party may challenge a prospective juror for cause if such juror "has a state of mind that is likely to preclude him [or her] from rendering an impartial verdict based upon the evidence adduced at the trial" (accord People v Harris 19 NY3d 679, 685 [2012]; People v Arnold, 96 NY2d 358, 362 [2001]).  "When a [prospective] juror's impartiality is in doubt, it is the court's obligation to make further inquiries and to excuse the juror if the doubt is not fully dispelled" (People v Russell, 116 AD3d 1090, 1093 [2014]; see People v Harris, 19 NY3d at 685; People v Young, 119 AD3d 970, 971 [2014]).  Notably, "[i]f there is any doubt about a prospective juror's impartiality, [the] trial court[] should err on the side of excusing the juror, since at worst the court will have replaced one impartial juror with another" (People v Arnold, 96 NY2d at 362 [internal quotation marks and citation omitted]; see People v Russell, 116 AD3d at 1093; People v Izzo, 104 AD3d 964, 966 [2013], lv denied 21 NY3d 1005 [2013]; People v McGuire, 101 AD3d 1386, 1389 [2012]).

During the course of voir dire, the prosecutor inquired as to whether any of the prospective jurors would require the People to prove that defendant had a quantifiable percentage of alcohol in her blood; specifically, the prosecutor asked if any of the prospective jurors would "absolutely need a [blood alcohol content] number in order to be convinced beyond a reasonable doubt that [defendant was] intoxicated by alcohol."  In response, prospective juror No. 9 raised his hand and said, "yeah," he would need "[s]omething more" than the relevant deputy's "investigation" in order to find defendant guilty of driving while intoxicated.  Additional colloquy between this juror and the prosecutor ensued, during the course of which the discussion

turned to the topic of field sobriety tests. Although the juror acknowledged that testimony regarding the deputy's "specialized training" and/or any admissions made by defendant would "help" in resolving the intoxication issue, he also unequivocally stated that he was adhering to his "original answer," i.e., he would be unwilling to convict defendant of driving while intoxicated based "solely on the field sobriety tests." The prosecutor thereafter challenged this juror for cause, noting that the juror "basically doesn't believe in field sobriety testing."

Although defendant argues that County Court abused its discretion in granting the People's challenge for cause as to this juror, we disagree. Regardless of whether the juror was correct as to whether an individual could in fact be convicted of driving while intoxicated based solely upon proof that he or she failed certain field sobriety tests, the juror's comments — viewed "in context and as a whole" (People v Lee, 66 AD3d 1116, 1119 [2009] [internal quotation marks and citation omitted]) — evidence, at the very least, an opinion regarding the People's burden of proof and a corresponding reluctance, if not potential unwillingness, to abide by the court's instructions as to the proper legal standards. Further, despite this juror's often uncertain and/or ambiguous responses (see People v Izzo, 104 AD3d at 965-966; People v McGuire, 101 AD3d at 1388-1389), no unequivocal assurance of impartiality was sought — much less obtained — from him. Under these circumstances, County Court properly exercised its discretion in granting the People's challenge for cause (cf. People v Otero, 56 AD3d 350, 351 [2008], lv denied 14 NY3d 804 [2010]; People v Kenner, 8 AD3d 296, 297 [2004]; see generally People v Hinds, 93 AD3d 536, 537 [2012], lv denied 19 NY2d 974 [2012]).

Defendant next contends that she lacked the culpable mental state required for manslaughter in the second degree and, therefore, the verdict convicting her of that crime is not supported by legally sufficient evidence and is against the weight of the evidence. Insofar as is relevant here, "[a] person is guilty of manslaughter in the second degree when . . . [h]e [or she] recklessly causes the death of another person" (Penal Law § 125.15 [1]). For purposes of this statute, a person acts "recklessly" when, among other things, he or she "is aware of and

consciously disregards a substantial and unjustifiable risk" that death or injury will occur (Penal Law § 15.05 [3]; see People v Asaro, 21 NY3d 677, 684 [2013]).[8]  That risk, in turn, "must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law § 15.05 [3]), i.e., the risk must reflect "the kind of seriously blameworthy carelessness whose seriousness would be apparent to anyone who shares the community's general sense of right and wrong" (People v Asaro, 21 NY3d at 685 [internal quotation marks and citations omitted]).  Although the awareness and corresponding disregard of such a risk indeed is measured from the defendant's perspective, "objective evidence of the surrounding circumstances may be weighed in making [that] factual determination" (People v Licitra, 47 NY2d 554, 559 [1979]).

As a starting point, the fact that defendant was acquitted of driving while intoxicated does not preclude a finding that her conduct on the night in question was reckless, nor does her acquittal in this regard undermine her conviction of manslaughter in the second degree (see People v Reichel, 110 AD3d 1356, 1363-1364 nn 12, 13 [2013], lv denied 22 NY3d 1090 [2014]).  Intoxication is not an element of manslaughter in the second degree (see Penal Law § 125.5 [1]).  Moreover, there was ample evidence before the jury that defendant was impaired by the consumption of alcohol on the night in question — indeed, the jury convicted defendant of driving while ability impaired — and such impairment, coupled with defendant's admitted conduct in attempting to retrieve her GPS unit and the overall manner in which she operated her motor vehicle on the night in question, established the recklessness necessary to sustain her conviction of manslaughter in the second degree.

---

[8]  Although "[a] person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto" (Penal Law § 15.05 [3]), we are not evaluating defendant's conduct with respect to this particular aspect of recklessness.

Defendant, by her own admission, consumed two "regular" glasses of wine in a roughly 45-minute period and thereafter failed three field sobriety tests administered at the scene of the accident.[9]  Within minutes of finishing her second glass of wine, defendant operated her vehicle — at night and on an unfamiliar road — while "fiddling on the floor" of her vehicle in an attempt to retrieve her GPS unit, even though she could still hear the directions being conveyed to her.  Again, by her own admission, defendant's attempts to retrieve the GPS unit caused her to only "[s]poradically" watch where she was going, as a result of which defendant never saw (1) the warning sign, (2) the stop sign, (3) the intersection in question, or (4) the victim's vehicle prior to the collision.  Notably, defendant acknowledged that she was not aware of the stop sign because she was not looking at the road ahead of her, that she did not have her eyes on the road as she entered the intersection, that there was a risk associated with attempting to retrieve her GPS unit while driving and that she ultimately disregarded that risk.  Although it is unclear whether defendant exceeded the posted speed limit as she traveled north on Jockey Street,[10] the accident reconstructionist testified that the minimum speed of defendant's vehicle prior to impact was at least 46 miles per hour and that there was no evidence that defendant braked prior to impact. Such proof, combined with the testimony offered by Tevendale and Feulner as to the manner in which defendant operated her vehicle in the moments leading up to the accident, is more than sufficient to establish that defendant acted with the required degree of recklessness.  Accordingly, we are satisfied that the verdict is supported by legally sufficient evidence and is in accord with the weight of the evidence.

------

[9]  Although defendant suggested that she failed the horizontal gaze nystagmus test due to a muscular disorder in her eyes, she acknowledged that she "did terrible" on the heel-to-toe test and "was all over the place" when the deputy asked her to stand on one leg.

[10]  The posted speed limit was 55 miles per hour.  Tevendale testified that he was traveling between 55 and 58 miles per hour, and that defendant's vehicle was traveling faster than that.

As for County Court's charge to the jury, to the extent that defendant contends that the court erred in failing to define the term "intoxication" in the context of its charge as to manslaughter in the second degree,[11] this issue is unpreserved for our review (see People v Green, 119 AD3d 23, 30 [2014], lv denied 23 NY3d 1062 [2014]). Further, inasmuch as County Court's charge with respect to manslaughter in the second degree mirrored that set forth in the pattern jury instructions for that crime (see CJI2d[NY] Penal Law § 125.15) and, therefore, "correctly convey[ed] the proper standards for the jury to apply" (People v Rebollo, 107 AD3d 1059, 1061 [2013] [internal quotation marks and citation omitted]; accord People v Rolfe, 83 AD3d 1217, 1218-1219 [2011], lv denied 17 NY3d 809 [2011]), we discern no basis upon which to take corrective action in the interest of justice (see People v Green, 119 AD3d at 30).

Defendant also ascribes error to the manner in which County Court responded to a note from the jury asking if the term "intoxication" had a particular meaning in the context of the count charging manslaughter in the second degree. Where a jury requests clarification or further instruction, "the court must direct that the jury be returned to the courtroom and, after notice to both the [P]eople and counsel for the defendant, and in the presence of the defendant, must give such requested information or instruction as the court deems proper" (CPL 310.30). "[W]hile [the] trial court is without discretion in deciding whether to respond, the court does have discretion as to the substance of the response" (People v Santi, 3 NY3d 234, 248 [2004]) — the only caveat being that the court's response must be "meaningful" (People v Clark, 108 AD3d 797, 799 [2013] [internal quotation marks and citation omitted]; see People v Acevedo, 118 AD3d 1103, 1107 [2014]; People v Arce, 70 AD3d 1196, 1197-1198 [2010]; People v Carpenter, 52 AD3d 1050, 1051 [2008], lv denied 11 NY3d 735 [2008], cert denied 556 US 1131 [2009]).

Here, on the third day of deliberations, the jury tendered a note (court exhibit No. 9) inquiring, "Is there a definition of

_____

[11] County Court did define intoxication during its charge to the jury as to the two counts of driving while intoxicated.

'intoxication' as described in [c]harge [1], definition of reckless." A lengthy discussion among the prosecutor, defense counsel, County Court and, ultimately, the jury's foreperson ensued in an effort to both decipher the precise nature of the jury's inquiry and formulate an appropriate response thereto. Upon seeking further clarification from the foreperson, and after consultation with the prosecutor and defense counsel, County Court indicated that its proposed response to the jury would be, "No, reckless is determined by the definition given." Defense counsel agreed with County Court's proposed answer, stating, "I believe that should be the only instruction given to the jury. Intoxication isn't an element of recklessness, and it's defined pretty clearly." To the extent that defendant can now be heard to complain, we are satisfied — upon our review of the extended discussion had in this regard — that County Court provided a meaningful response to the jury's inquiry.

As a final matter, we find no merit to defendant's claim that she was denied the effective assistance of counsel based upon defense counsel's failure to object to a particular question posed to defendant by the prosecutor — inquiring as to whether defendant had "met with" her attorney prior to testifying — and, further, to request that the jury be charged as to the lesser included offense of criminally negligent homicide. "To establish an ineffective assistance of counsel claim, defendant was required to show that counsel failed to provide meaningful representation and an absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct" (People v Lapi, 105 AD3d 1084, 1086 [2013], lv denied 21 NY3d 1043 [2013] [internal quotation marks and citations omitted]). As a general proposition, defense counsel's failure to object to or request that the jury be charged as to a lesser included offense "is not the type of clear-cut and completely dispositive error that rises to the level of ineffective assistance of counsel" (People v Harris, 97 AD3d 1111, 1112 [2012], lv denied 19 NY3d 1026 [2012] [internal quotation marks and citation omitted]). Rather, "whether to object to [or request] the submission of a lesser included offense is often a strategic decision that could reasonably be made either way. A defendant who thinks his [or her] chances of acquittal are small may welcome giving the jury an opportunity for a compromise verdict" (People v Turner, 5 NY3d

476, 483 [2005]); alternatively, a defendant may elect "not to request a lesser included offense in hopes of securing a complete acquittal" (People v Wicks, 73 AD3d 1233, 1236 [2010], lv denied 15 NY3d 857 [2010]).  Here, based upon defendant's theory of the case — namely, that she lacked the culpable mental state required to sustain a conviction of manslaughter in the second degree — counsel's decision not to request the lesser included offense of criminally negligent homicide arguably represented a legitimate trial strategy, and "[t]he fact that this reasonable strategy proved unsuccessful does not equate with ineffective assistance of counsel" (People v Casseus, 120 AD3d 828, 830 [2014]).

We reach a similar conclusion with regard to counsel's failure to object when the prosecutor asked defendant if she had "met with" her attorney prior to trial.  As a starting point, we reject defendant's assertion that the prosecutor's inquiry in this regard was the functional equivalent of impermissibly questioning defendant as to her invocation of the right to counsel (compare People v Morrice, 61 AD3d 1390, 1391 [2009]). That said, even assuming that the question was improper, we do not find it to be "so egregious as to deny defendant a fair trial" (People v Rawleigh, 89 AD3d 1483, 1484 [2011], lv denied 18 NY3d 961 [2012]).  Further, defense counsel's decision not to object to this singular question may well have been "a reasonable and legitimate strategy under the circumstances" (People v Taylor, 1 NY3d 174, 177 [2003] [internal quotation marks and citations omitted]; see People v Sabines, 121 AD3d 1409, 1412 [2014]) — particularly given the manner in which defense counsel questioned certain of the People's witnesses as to their contact with the prosecutor prior to trial.  Defendant's remaining contentions, including her assertion that the sentence imposed was harsh and excessive, have been examined and found to be lacking in merit.

Garry, J.P., Lynch and Clark, JJ., concur.

        ORDERED that the judgment is affirmed, and matter remitted to the County Court of Saratoga County for further proceedings pursuant to CPL 460.50 (5).


                        ENTER:

                        Robert D. Mayberger
                        Clerk of the Court