*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  February 18, 2016                     106477
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                        Respondent,

        v                                    MEMORANDUM AND ORDER

ANDREW JONES,
                        Appellant.
_____


Calendar Date:  January 8, 2016

Before:  Peters, P.J., Garry, Egan Jr. and Clark, JJ.

                        _____


        Bruce Evans Knoll, Albany, for appellant.

        P. David Soares, District Attorney, Albany (Michael C.
Wetmore of counsel), for respondent.

                        _____


Egan Jr., J.

        Appeal from a judgment of the County Court of Albany County
(Ryan, J.), rendered July 18, 2001, upon a verdict convicting
defendant of the crime of assault in the second degree.

        During the early morning hours of October 6, 2000,
defendant[1] and two of his friends – Julio Vazquez and Wayne

_____

        [1]  Although defendant was indicted as Andrew Jones, the
People subsequently discovered that defendant's true name was
Andrew James.  At trial, County Court granted the People's oral
motion to amend the indictment, but various posttrial materials
in the record on appeal, including correspondence from the
Department of Corrections and Community Supervision, nonetheless

Holmes — were patrons at a bar in the City of Albany. While there, defendant paid a dancer $20 for a lap dance. Apparently dissatisfied with the dancer's performance, defendant began to quarrel with her, prompting the establishment's owner, Daniel Cadalso, to intervene. Although Cadalso issued defendant a refund, defendant remained irate, stating that "he was going to shoot the place up" and generally "making a huge scene in front of the whole bar." Cadalso enlisted the assistance of Vazquez in an effort to remove defendant from the premises, but Vazquez assured Cadalso that everything was under control; defendant, who had just ordered a drink from the bar, was not inclined to leave.

Cadalso then went to speak with Christopher Disonell, who was working the door at the club, and apprised him of the situation. As Cadalso and Disonnell were speaking, defendant approached and launched into another verbal tirade, during the course of which Holmes charged Cadalso and pinned him against the wall while Vazquez blocked the exit. Following a brief struggle, Cadalso broke free, ran outside and called 911. Meanwhile, defendant approached Disonell, leaned in and said that "he was going to stick [Disonell]." Believing that he "was going to get stabbed," Disonell punched defendant in the face and thereafter was struck on the right side of his face with a beer bottle wielded by Holmes. Immediately thereafter, defendant struck Disonell on the left side of his face with "[a] mixed drink glass." Both the beer bottle and the drink glass broke upon impact, cutting Disonell's face and sending blood "all over the place." Disonell then went to the bathroom and attempted to stop the bleeding. Cadalso, who still was outside on the phone with the police, saw defendant, Holmes and Vazquez exit the club and climb into "a big, white, flatbed towing vehicle."

When Cadalso reentered the establishment, he observed "[b]roken glass, broken chairs and a lot of blood." Cadalso then

---

refer to defendant as Andrew Jones. For that reason, we have captioned this matter in accordance with defendant's name as it appeared on the underlying indictment. There is, however, no question that defendant and Andrew James are one and the same person.

went in search of Disonell, whom he found — "cut pretty bad" — in the bathroom holding a towel to his face. According to Cadalso, Disonell had "[d]eep — very deep, wide-open lacerations in both his cheeks and a big, deep cut . . . on the bridge of his nose" and "was really, really bleeding profusely." Cadalso drove Disonell to a local hospital,[2] following which Cadalso returned to the scene and identified defendant, Holmes and Vazquez as the individuals involved in the disturbance at the club. Defendant and Holmes then were placed under arrest.

As a result of this incident, defendant was indicted and charged in December 2000 with assault in the second degree.[3] Following a jury trial in April 2001, defendant was found guilty as charged and thereafter was sentenced, as a second felony offender, to seven years in prison followed by five years of postrelease supervision. This appeal by defendant ensued.[4]

---

[2] A member of the Albany Police Department, who saw Disonell at the hospital, offered a similar assessment of Disonell's injuries, stating, "He was sliced up very badly. Both sides of his nose had pretty big gashes and into his cheek area."

[3] According to the People, Holmes separately pleaded guilty to assault in the second degree for his role in the attack.

[4] Although defendant filed a notice of appeal in July 2001, defendant, for reasons that are not apparent from the record, did not perfect his appeal in this Court until June 2015. The People did not move to dismiss the appeal in the interim, and this Court's rule regarding the abandonment of criminal appeals (see 22 NYCRR 800.14 [j]) did not go into effect until July 28, 2014 — after the point in time when this Court, among other things, granted defendant's motion for permission to proceed as a poor person and for the assignment of counsel. As for the underlying delay, defense counsel acknowledged at oral argument that, while this appeal was pending, defendant was convicted of murder in the second degree — for which he is serving a lengthy term of imprisonment — and suggested that the delay in pursuing the instant appeal was attributable to that intervening criminal matter.

Defendant first asserts that he was deprived of a fair trial due to the People's intermingling of the proof relative to Holmes' and defendant's respective actions on the morning in question. Specifically, defendant contends that the People failed to sufficiently differentiate between the injuries to the right and left sides of Disonell's face, thereby raising the possibility that defendant was indicted for — and ultimately was convicted of — a crime that he did not actually commit. We disagree. The grand jury minutes, as well as the trial transcript — from the opening statements, to the testimony offered by Cadalso and Disonell, to the People's closing argument — reflect that the People drew a clear distinction between both the injuries that Disonell received to the right and the left sides of his face and the individuals who caused such injuries. Accordingly, we are satisfied that defendant was "tried and convicted of only those crimes and upon only those theories charged in the indictment" (People v Wilson, 61 AD3d 1269, 1271 [2009] [internal quotation marks and citations omitted], lv denied 14 NY3d 774 [2010]).

Although defendant's present challenge to the legal sufficiency of the evidence is unpreserved for our review, "our weight of the evidence review necessarily involves an evaluation of whether all elements of the charged crime were proven beyond a reasonable doubt at trial" (People v Burch, 97 AD3d 987, 989 n 2 [2012] [internal quotation marks and citations omitted], lv denied 19 NY3d 1101 [2012]). In this regard, "[a] person is guilty of assault in the second degree when . . . [h]e [or she] recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.05 [4]; see People v Heier, 90 AD3d 1336, 1337 [2011], lv denied 18 NY3d 994 [2012]). "Serious physical injury" includes, insofar as is relevant here, "serious and protracted disfigurement" (Penal Law § 10.00 [10]), and a "[d]angerous instrument" is defined as "any instrument, article or substance, . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury" (Penal Law § 10.00 [13]; see People v Griffith, 254 AD2d 753, 753-754 [1998] [10-ounce bar glass qualifies as a dangerous instrument]). Finally, a person acts "recklessly" when he or she "is aware of

and consciously disregards a substantial and unjustifiable risk that [a] result will occur" (Penal Law § 15.05 [3]; see People v Gallo, 133 AD3d 1088, 1089 [2015]). Specifically, the risk at issue "must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law § 15.05 [3]; accord People v Briskin, 125 AD3d 1113, 1119 [2015], lv denied 25 NY3d 1069 [2015]).

Here, defendant primarily disputes the proof adduced with respect to the "serious physical injury" element of the charged crime. Specifically, defendant contends that the record as a whole does not establish that Disonell suffered "serious and protracted disfigurement" as the result of defendant's actions in cutting the left side of Disonell's face with the drink glass. We disagree. Disonell testified — without contradiction — that he had "plastic surgery" and received 150 stitches to close his facial wounds. Disonell further testified that he was on prescription pain medication for approximately one week following the attack and that he missed three or four weeks of work as a result thereof. Additionally, a photograph taken shortly after the assault and admitted into evidence at trial clearly depicts a significant wound to the left side of Disonell's face, and Disonell testified at trial (some six months after the incident occurred) that he had facial scarring as a result of the assault — specifically, a scar on the left side of his face that was a "[f]ew inches" long. Finally, the record reflects that Disonell separately displayed the scars on each side of his face to the jury. Although Disonell's medical records admittedly did not shed much light on the extent of his injuries, we nonetheless are satisfied that the jury's verdict was in accord with the weight of the evidence.

To the extent that defendant argues that County Court failed to define "serious and protracted disfigurement" for the jury, we need note only that defendant neither objected to the charge as given nor requested additional or different language. Accordingly, this issue is unpreserved for our review (see People v Davis, 133 AD3d 911, 914 [2015]). In any event, County Court can hardly be faulted for failing to provide the jury with the definition of "serious and protracted disfigurement" set forth in

People v McKinnon (15 NY3d 311 [2010]) when the Court of Appeals did not craft that definition until more than nine years after defendant's jury trial.  Defendant's remaining arguments relative to the jury charge and resulting verdict – including his assertion that County Court erred in refusing to charge the lesser included offense of assault in the third degree and that the jury improperly rejected his justification defense – have been examined and found to be lacking in merit.

     That said, we do find merit to defendant's claim that County Court erred in denying his Batson challenge with respect to prospective juror No. 2 and, therefore, we reverse the judgment and remit this matter for a new trial.  As a threshold matter, we reject the People's assertion that defendant failed to preserve this issue for our review.  "[A] Batson claim can be raised at any time during the jury selection process" (People v Perez, 37 AD3d 152, 154 [2007]; see Matter of Robar v LaBuda, 84 AD3d 129, 138 n 6 [2011]).  More to the point, the People's present assertion – that defendant failed to specifically object to the prosecutor's refusal to provide a race-neutral explanation for the exclusion of prospective juror No. 2 – "is inconsistent with the process by which a Batson analysis is made . . .; it is defendant's objections that give rise to the prosecutor's obligation to state race-neutral reasons for the disputed challenges in the first place" (People v Davis, 253 AD2d 634, 635 [1998]).[5]

     As to the merits, where a Batson challenge is raised (see Batson v Kentucky, 476 US 79 [1986]), the trial court must engage in a three-step process.  "At step one, the moving party bears the burden of establishing a prima facie case of discrimination in the exercise of peremptory challenges.  Once a prima facie case of discrimination has been established, the burden shifts, at step two, to the nonmoving party to offer a facially neutral explanation for each suspect challenge.  At the third step, the

_____

     [5]  In any event, defense counsel did expressly note "that there ha[d]n't been any race-neutral reason provided" with respect to prospective juror No. 2.

burden shifts back to the moving party to prove purposeful discrimination and the trial court must determine whether the proffered reasons are pretextual" (People v Hecker, 15 NY3d 625, 634-635 [2010] [internal quotation marks and citations omitted]; see People v Grafton, 132 AD3d 1065, 1066 [2015]).

Here, the record reflects that the People sought to exercise peremptory challenges to exclude four of the five nonwhite individuals comprising the second panel of prospective trial jurors. Indeed, as defense counsel noted, "The only [nonwhite juror] who was not excluded [from this panel] was the daughter-in-law of the former Chief of Police of the Albany Police Department." In response to defense counsel's Batson challenge, County Court asked the People — "based upon the peremptory challenges" asserted — to "give a race-neutral reason . . . for th[o]se selections," thereby implicitly finding that defendant had made a prima facie showing of discrimination. The People provided such an explanation as to prospective juror Nos. 4, 6 and 17 but refused to offer a race-neutral explanation as to prospective juror No. 2, noting that this juror was the first nonwhite juror that they had sought to exclude by use of a peremptory challenge. As the prosecuting attorney succinctly put it, "I shouldn't be made to give a reason for the first one." Defense counsel took issue with the People's lack of a race-neutral explanation for the exclusion of this juror, noting that "the fact that [prospective juror No. 2] was the first person of color [to be] excluded [was] . . . merely fortuitous." County Court rejected defendant's argument on this point and allowed the People to exercise a peremptory challenge to exclude prospective juror No. 2, as well as prospective juror Nos. 4 and 6.

The foregoing stance — that the People were not required to provide a race-neutral explanation for seeking to exclude prospective juror No. 2 because she was the first person of color upon whom the People sought to exercise a peremptory challenge — is simply wrong. "The purpose of the Batson rule is to eliminate discrimination, not minimize it" (People v Bolling, 79 NY2d 317, 321 [1992]). Accordingly, because "[t]he exclusion of any [nonwhite prospective jurors] solely because of their race is constitutionally forbidden" (id. at 321 [internal quotation marks and citation omitted]), a defendant asserting a Batson challenge

need not show a pattern of discrimination.  "Although as part of their prima facie case parties often rely on numbers to show a pattern of strikes against a particular group of jurors, a prima facie case may be made based on the peremptory challenge of a single juror that gives rise to an inference of discrimination" (People v Smocum, 99 NY2d 418, 421-422 [2003]; see People v Morgan, 75 AD3d 1050, 1053 [2010], lv denied 15 NY3d 894 [2010]).

Here, County Court implicitly concluded that defendant had made a prima facie showing of discrimination as to all four of the jurors in question, and the burden then shifted to the People to provide race-neutral explanations for all four — not just three — of the nonwhite prospective jurors against whom the People asserted peremptory challenges.  Given the People's failure to provide — and County Court's failure to require — such an explanation as to all four prospective jurors, defendant is entitled to a new trial.

Peters, P.J., Garry and Clark, JJ., concur.

ORDERED that the judgment is reversed, on the law, and matter remitted to the County Court of Albany County for a new trial.

ENTER:

Robert D. Mayberger
Clerk of the Court