People v Cason (2022 NY Slip Op 01481)





People v Cason


2022 NY Slip Op 01481


Decided on March 10, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:March 10, 2022

110596
[*1]The People of the State of New York, Respondent,
v
Donnie L. Cason II, Appellant.

Calendar Date:January 7, 2022

Before:Garry, P.J., Egan Jr., Aarons and Colangelo, JJ.

Rural Law Center of New York, Castleton (Keith F. Schockmel of counsel), for appellant.
Patrick A. Perfetti, District Attorney, Cortland, for respondent.



Colangelo, J.
Appeal from a judgment of the Supreme Court (Campbell, J.), rendered June 4, 2018 in Cortland County, upon a verdict convicting defendant of the crimes of burglary in the second degree, criminal mischief in the fourth degree, harassment in the second degree, criminal contempt in the second degree (22 counts) and tampering with a witness in the fourth degree.
In June 2017, defendant was charged by indictment with burglary in the second degree, two counts of criminal contempt in the first degree, criminal trespass in the second degree, criminal mischief in the fourth degree and harassment in the second degree based on allegations that, on January 20, 2017, he forcibly entered the residence of the mother of his children (hereinafter the victim) and harassed the victim in violation of an extant order of protection issued in her favor. In October 2017, defendant was charged in a separate indictment with 22 counts of criminal contempt in the first degree and tampering with a witness in the fourth degree, based on defendant's alleged intentional violations of an order of protection issued on January 21, 2017 and his attempts to dissuade the victim from testifying before a grand jury regarding the facts and circumstances of the January 20, 2017 incident. The People moved successfully to consolidate the two indictments, and a jury trial ensued in the Integrated Domestic Violence part of Supreme Court. Following a jury trial, defendant was convicted of burglary in the second degree, criminal mischief in the fourth degree, harassment in the second degree, 22 counts of criminal contempt in the second degree and tampering with a witness in the fourth degree. He was thereafter sentenced, as a second felony offender, to eight years in prison, to be followed by five years of postrelease supervision, on the burglary conviction and to various lesser concurrent prison terms on the remaining convictions. Supreme Court also issued a full stay-away order of protection in favor of, among others, the victim and their two children. Defendant appeals.
Defendant contends that his conviction for burglary in the second degree is not supported by legally sufficient evidence and is against the weight of the evidence as there was insufficient proof establishing that he possessed the requisite intent to commit a crime upon his entry into the victim's residence. Although defense counsel moved for a trial order of dismissal at the close of the People's proof, as counsel failed to renew said motion "after the presentation of [the] defense case, defendant failed to preserve his legal sufficiency challenge" (People v Walker, 190 AD3d 1102, 1103 [2021], lvs denied 37 NY3d 958, 961 [2021]; see People v Lane, 7 NY3d 888, 889 [2006]). "Nevertheless, as part of our weight of the evidence review, we necessarily determine whether the People proved each element of the charged crimes beyond a reasonable doubt" (People v Walker, 190 AD3d at 1103 [citations omitted]; see People v Serrano[*2], 200 AD3d 1340, 1341-1342 [2021]; People v Barzee, 190 AD3d 1016, 1017 [2021], lv denied 36 NY3d 1094 [2021]). "In a weight of the evidence analysis, we view the evidence in a neutral light and determine whether a different verdict would have been unreasonable; if a different verdict would not have been unreasonable, we weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Ferguson, 193 AD3d 1253, 1254 [2021] [citations omitted], lv denied 37 NY3d 964 [2021]; see People v Danielson, 9 NY3d 342, 348 [2007]; People v Bleakley, 69 NY2d 490, 495 [1987]). In conducting this analysis, "[g]reat deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor" (People v Bleakley, 69 NY2d at 495; see People v Cubero, 160 AD3d 1298, 1300 [2018], affd 34 NY3d 976 [2019]).
For defendant to be found guilty of burglary in the second degree as charged in the indictment, the People were required to prove that defendant "knowingly enter[ed] or remain[ed]" in the victim's home unlawfully with the "intent to commit a crime therein" (Penal Law §140.25 [2]). "A person 'enters or remains unlawfully' in or upon premises when he [or she] is not licensed or privileged to do so" (Penal Law § 140.00 [5]). Since the People did not expressly limit their theory of liability to the intent to commit a specific crime, there was "no requirement that the People allege or establish the particular crime that defendant intended to commit upon entering the dwelling" (People v Taylor, 163 AD3d 1275, 1276 [2018], lv denied 32 NY3d 1068 [2018]). "[A] defendant's intent to commit a crime may be properly inferred from, among other things, the circumstances of the entry, his or her unexplained presence in the [dwelling] and his or her actions and statements while on the premises" (People v Saylor, 173 AD3d 1489, 1491 [2019] [internal quotation marks, brackets and citations omitted]; see People v Lewis, 5 NY3d 546, 552 [2005]; People v Hajratalli, 200 AD3d 1332, 1336 [2021]). Notably, "'the intent necessary for burglary can be inferred from the circumstances of the entry itself'" (People v Kelly, ___ AD3d ___, ___, 2022 NY Slip Op 00695, *1 [2022], quoting People v Mackey, 49 NY2d 274, 280 [1980]).
The evidence at trial established that defendant and the victim were the parents of two daughters. Earlier in the day, on January 20, 2017, the victim came home from the hospital after giving birth two days earlier to their second daughter by cesarean section. Her activities were restricted, and defendant was at the residence to help her and take care of their older child. The victim's mother took defendant and the victim to see their newborn at the hospital and, upon their return, defendant, the victim's brother and the boyfriend of the victim's mother picked [*3]up dinner for the family at Kentucky Fried Chicken. Upon their return, defendant argued with the victim about having paid for the dinner with a small amount of money in his bank account and not having been reimbursed as promised. After dinner, defendant bathed the older child and helped put her to sleep. He and the victim argued again. Defendant went into the kitchen and packed up the remaining food to take to his apartment. Defendant and the victim's mother argued about the food, and, at her request, defendant left the residence. After leaving, defendant repeatedly telephoned the victim, but she did not take his calls. She text-messaged defendant that she was in pain and was worried about their newborn, and she asked him to stop calling. While at his apartment, defendant took Adderall and gulped down four to five ounces of brandy; he then walked back to the victim's residence. The front door had been locked, preventing his reentry, and defendant rattled the door handle, stating, "[L]et me in this house. I am going to enter this house." He ignored orders that he leave and, instead, rang the doorbell and pounded on the door several times. He then proceeded to a living room window and pounded on it until the glass shattered and he gained entry. After he entered the house, defendant went into the kitchen and shoved the victim's mother, who had been standing protectively in front of the victim, to the floor. He then grabbed the victim and "attacked [her] to the ground." After she got up and walked by the refrigerator, "he started coming after [her] again . . . and then he was screaming at her . . . and he kept slamming [her] against the [fire extinguisher on the] wall." The victim testified that her head hit the fire extinguisher and this happened at least seven or eight times. The victim testified that she felt numb and scared, and she hurt everywhere.
The victim's mother testified that she lives with the victim and her two granddaughters and that defendant does not live there nor does he have a key or get mail delivered there. The victim's mother testified that, upon hearing noises in the living room, she initially ran in there but went back into the kitchen and positioned herself in front of the victim to protect her because "[she] knew something was going to happen." The victim's mother testified that she was "[s]cared, overwhelmed [and] worried." The victim's mother testified that, during the incident, the victim's glasses had "flung off," and defendant "pushed [the victim] up against the wall knowing she just had [a cesarean] section." As the victim got up, defendant "pulled [her] back down." She and the victim were crying; she "was scared for [the victim's] life." According to the victim's mother, defendant ran out of the house while she was on the phone with the 911 dispatcher, and, as he left, he tried to grab her hand that held the phone. According to the victim and her mother, there was shattered glass on the carpets[*4], the floors, the couch and in the baby's bassinet. The furniture was in disarray and the curtains on the broken window were ripped down and laying over the couch. The victim's glasses were broken and were found underneath the stove. The victim's mother also testified that defendant did not have permission to return to the house that evening.
Cheyenne Cute, a sergeant with the City of Cortland Police Department, testified that she and two other officers responded to the residence. She observed a 4 feet by 4 feet picture window that had been smashed out and there was glass on the couch and on the living room floor. Cute then spoke to the victim and her mother and learned that defendant had repeatedly smashed the victim's head into a fire extinguisher on the kitchen wall. Cute described the victim's demeanor as "[u]pset, very upset, scared . . . [and] [j]ust extremely upset, distraught." Cute then took photographs of the scene, which were admitted as evidence during the trial. Defendant was arrested shortly after the incident.
Defendant testified on his own behalf. He explained that he was arguing with the victim initially because he was upset that he was not reimbursed for the cost of the dinner from Kentucky Fried Chicken. After dinner, defendant gave the older child a bath and put her to bed. Once the child was asleep, defendant went downstairs to see if the victim needed anything and went upstairs and started watching a video. He recounted that the victim came upstairs and gave him an attitude because he did not bring a pillow and blanket downstairs for her — he claimed not to have heard the request — and he became upset because his efforts to be a good father were going unnoticed. Defendant further testified that he decided to go back to his apartment for the night, so he went into the kitchen and started packing up the leftovers for himself and his roommates. As defendant was walking to his apartment, he called the victim repeatedly, feeling remorse for having left the victim and the older child, particularly because the victim's activities were limited due to the surgery. The victim did not answer her phone and text-messaged back in a rude and upsetting manner, causing him to feel worse. As he walked back to the victim's residence after ingesting pills and alcohol, he continued to call the victim. She text-messaged him that she did not want the drama or the problems.
Once back at the house defendant became distraught when he found the door to be locked, explaining that there is usually an open-door policy where he can just walk in and out. He admitted that he started banging on the door and ringing the doorbell. He then walked to the living room window and observed the victim's mother yelling at the victim and telling her not to open the door. He observed the victim walk into the kitchen and he began banging on the window, yelling for her to answer the phone, and "the next thing [he] kn[ew] the window gave way." Defendant [*5]testified that after he landed inside, the mother's boyfriend grabbed him and he tried to get away from him. He did not try to hurt anyone in the house and tried to leave through the kitchen, but everyone thought that he was going to attack the victim and they blocked his way, thwarting his efforts to leave through the front door. As he was trying to leave, the victim's mother grabbed him while she was on the phone with the police and he pushed her away, in order to leave. He testified that he entered to talk to the victim and resolve things and did not intend to commit a crime.
On this record, an acquittal on the burglary count would not have been unreasonable had the jury resolved the credibility issues differently. According great deference to the jury's credibility determinations and viewing the evidence in a neutral light, and considering the inferences that may properly be drawn from, among other things, the circumstances of the entry, we are satisfied that the burglary conviction is supported by the weight of the evidence (see People v File, ___ AD3d ___, ___, 2022 NY Slip Op 00077, *2 [2022]; People v Walker, 191 AD3d 1154, 1158 [2021], lv denied 37 NY3d 961 [2021]).
Defendant also contends that County Court committed reversible error when it failed to provide a meaningful response to the following questions posed by the jury in a single note: "[I]f [defendant]'s only intent in entering the dwelling was to talk to [the victim] who did not want to talk to him, does that qualify as intent to commit a crime?" and "Does the act of breaking the glass on the window and entering the dwelling constitute intent to commit a crime." "It is well established that a trial court's 'core responsibility' upon receiving a substantive jury inquiry during deliberations in a criminal trial is to provide counsel with 'meaningful notice' of the note's specific content and to give the jury a 'meaningful response'" (People v Johnson, 183 AD3d 77, 81 [2020], lv denied 35 NY3d 993 [2020], quoting People v Kisoon, 8 NY3d 129, 134 [2007]; see CPL 310.30). The trial court has a statutory obligation to respond to jury requests for clarification made "[a]t any time during [the jury's] deliberations" (CPL 310.30). "[T]he court has significant discretion in determining the proper scope and nature of the response" (People v Taylor, 26 NY3d 217, 224 [2015]), and "'must perform the delicate operation of fashioning a response which meaningfully answers the jury's inquiry while at the same time working no prejudice to the defendant'" (People v Lee, 183 AD3d 1183, 1188 [2020], lv denied 35 NY3d 1114 [2020], quoting People v Williamson, 267 AD2d 487, 489 [1999], lv denied 94 NY2d 886 [2000]). In analyzing whether that discretion was abused, "'[t]he factors to be evaluated are the form of the jury's question, which may have to be clarified before it can be answered, the particular issue of which inquiry is made, the supplemental instruction actually given and the presence [*6]or absence of prejudice to the defendant'" (People v Lee, 183 AD3d at 1188, quoting People v Malloy, 55 NY2d 296, 302 [1982], cert denied 459 US 847 [1982]).
It was agreed at the charge conference that the general charge would include an expanded definition on intent, as contained in the Pattern Jury Instructions. Upon receipt of the foregoing note from the jury, Supreme Court held a conference with both counsel and then reread the expanded definition of intent; over defense counsel's objection, the court then gave a second instruction entitled "Jury as Trier of Facts" (see Pattern Jury Instructions 4:56). In reading the original and supplemental charges, the court emphasized to the jury that its questions were factual questions that the court could not properly answer. The court elected to read the supplemental charge explaining to the jury that it is the sole and exclusive judge of the facts, the credibility of the witnesses and the guilt or innocence of defendant. We find that Supreme Court meaningfully responded to the jury's note. By its election to charge the jury as to its role as the trier of fact and refrain from any answer that could be construed as the court's opinion regarding defendant's intent, the court "satisfied [its] obligation to fashion a meaningful response to the jury's request without causing prejudice to defendant" (People v Lee, 183 AD3d at 1191).
Defendant finally contends that his prison sentence is harsh and excessive. He further contends that the circumstances did not warrant the imposition of an order of protection prohibiting him from seeing his children for eight years. "It is well settled that a sentence that falls within the permissible statutory ranges will not be disturbed unless it can be shown that the sentencing court abused its discretion or that extraordinary circumstances exist warranting a modification in the interest of justice" (People v Walker, 191 AD3d at 1160 [internal quotation marks and citations omitted]; see People v Patterson, 199 AD3d 1072, 1076 [2021], lv denied 37 NY3d 1163 [2022]). The transcript of the sentencing hearing reflects that Supreme Court considered, among other things, defendant's lengthy criminal history involving crimes against people and property, his numerous violations of orders of protection, most recently with respect to the victim, and his lack of remorse. The court further took notice of mitigating factors such as defendant's difficult childhood and lack of family support during the trial. Considering the foregoing, as well as the violent nature of defendant's behavior and the fact that the sentence imposed was significantly less than the maximum term allowed (see Penal Law § 70.02 [1] [b]; [3] [b]; People v Gilmore, 177 AD3d 1029, 1029-1030 [2019], lv denied 35 NY3d 970 [2020]), we discern no extraordinary circumstances or abuse of discretion that would warrant modification of the prison sentence (see People v Infinger, 194 AD3d 1183, 1188 [2021], lv denied [*7]37 NY3d 965 [2021]; People v Porter, 184 AD3d 1014, 1020 [2020], lv denied 35 NY3d 1069 [2020]). As to the court's issuance of the order of protection in favor of, among others, the parties' children, to the extent that defendant's challenge was preserved by his request that the court carve out an exception to the order to allow for visitation with his older child, we find the challenge to lack merit. As the children live with the victim and in light of defendant's propensity to violate orders of protection, the determination to issue the order of protection was not an abuse of discretion (see People v Creech, 165 AD3d 1491, 1494 [2018]).
Garry, P.J., Egan Jr. and Aarons, JJ., concur.
ORDERED that the judgment is affirmed.