People v Ashe (2022 NY Slip Op 05234)

People v Ashe

2022 NY Slip Op 05234

Decided on September 22, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:September 22, 2022

111082
[*1]The People of the State of New York, Respondent,
v
Jabari K. Ashe, Appellant.

Calendar Date:August 17, 2022

Before:Egan Jr., J.P., Clark, Pritzker, Reynolds Fitzgerald and McShan, JJ.

Matthew C. Hug, Albany, for appellant.
Michael A. Korchak, District Attorney, Binghamton (Benjamin E. Holwitt of counsel), for respondent.

Clark, J.
Appeal from a judgment of the County Court of Broome County (Joseph F. Cawley Jr., J.), rendered June 21, 2018, upon a verdict convicting defendant of the crimes of murder in the second degree and criminal possession of a weapon in the second degree.
In May 2017, based upon allegations that he shot and killed the victim, Tyquan Gumbs, on the evening of April 28, 2017, defendant was indicted on the charges of murder in the second degree and criminal possession of a weapon in the second degree. Following a jury trial, three days of deliberations and the administration of an Allen charge to the jury, defendant was convicted as charged. County Court thereafter sentenced defendant to a prison term of 25 years to life on his conviction of murder in the second degree and a concurrent prison term of 15 years, followed by five years of postrelease supervision, for his conviction of criminal possession of a weapon in the second degree. Defendant appeals.
Defendant first contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence. Defendant's challenge to the legal sufficiency of the evidence, however, is unpreserved as a result of his failure to move for a trial order of dismissal (see People v Cooper, 196 AD3d 855, 858 [3d Dept 2021], lv denied 37 NY3d 1160 [2022]; People v Kelsey, 174 AD3d 962, 962 [3d Dept 2019], lv denied 34 NY3d 982 [2019], cert denied ___ US ___, 146 S Ct 2607 [2021]). Nevertheless, in the course of reviewing defendant's weight of the evidence challenge, this Court necessarily evaluates whether all elements of the charged crimes were proven beyond a reasonable doubt (see People v Jones, 101 AD3d 1241, 1241 [3d Dept 2012], lv denied 21 NY3d 944 [2013]; People v Mann, 63 AD3d 1372, 1373 [3d Dept 2009], lv denied 13 NY3d 861 [2009]). "When undertaking a weight of the evidence review, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and then, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Davis, 200 AD3d 1200, 1201 [3d Dept 2021] [internal quotation marks, brackets and citations omitted]; see People v Sweet, 200 AD3d 1315, 1316 [3d Dept 2021], lv denied 38 NY3d 930 [2022]). In conducting this analysis, this Court must view the evidence in a neutral light and defer to the jury's credibility determinations (see People v Terry, 196 AD3d 840, 845-846 [3d Dept 2021], lv denied 37 NY3d 1030 [2021]; People v Saunders, 176 AD3d 1384, 1388 [3d Dept 2019], lv denied 35 NY3d 973 [2020]).
As relevant here, "[a] person is guilty of murder in the second degree when[,] . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]). Additionally, "[a] person is guilty [*2]of criminal possession of a weapon in the second degree when" he or she knowingly "possesses any loaded firearm" and such possession takes place outside of his or her home or place of business (Penal Law § 265.03 [3]; see People v Ford, 66 NY2d 428, 440 [1985]). Importantly, "[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense" (CPL 60.22 [1]). Corroborative evidence "'need not show that [the] defendant was connected with the commission of the crime[; i]t is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth'" (People v Reome, 15 NY3d 188, 192 [2010], quoting People v Dixon, 231 NY 111, 116 [1921]).
The trial evidence demonstrated that, on April 22, 2017, a man named Brandon Hernandez was shot and killed. Body camera footage from a police officer who responded to the Hernandez shooting depicted defendant at the scene and later at the hospital, distraught over the shooting of his friend. The evidence established that a funeral was held for Hernandez six days later — on the day in question — and that the dress code for the service was all white. The evidence, including video footage, demonstrated that defendant, Jahcambi Anderson, Penial Pope, Antoine Thompson, Carheem Felton and Valentino Mondolfi attended the funeral service, each adhering to the dress code, and that they thereafter attended a barbeque at a certain apartment complex. As established by the evidence, that evening, defendant, Anderson, Pope, Thompson, Felton and Mondolfi left the barbeque and, in two cars, ultimately traveled to an address near a park on Fayette Street in the City of Binghamton, Broome County, where the victim was playing basketball. The victim was believed to be involved in the killing of their friend, Hernandez. The evidence, which included video footage, eyewitness testimony and a recorded 911 call, demonstrated that three men walked up the driveway where the victim was playing basketball and that a tall, thin individual wearing white pants and a gray hooded sweatshirt tied tightly around his head shot the victim twice from point-blank range, kicked the downed victim several times and then fled.
With respect to the identity of the shooter, the People primarily relied upon testimony from Pope, Anderson and Thompson, who testified as to their involvement in the shooting and the events leading up to it. Pope testified that, when he was at the barbeque, he heard someone say, "boy downtown," followed by, "Ty downtown," and that defendant thereafter came over and asked him for a ride. Pope stated that, at that point, he "knew what time it was" and that he proceeded to get into his vehicle — a Lexus — with Felton in the front passenger seat and defendant in the back seat. According to Pope, he was guided downtown to [*3]Fayette Street by Felton and defendant, who advised him to look for and catch up to a silver sedan. Pope testified that he met the other car at Fayette Street and that one of the people in the other car — Mondolfi, Thompson or Anderson — got out to talk with someone in his car.
Thompson similarly testified that, while at the barbeque, Anderson tapped him on the shoulder and told him that they were going to Fayette Street. Thompson asserted that he later heard Anderson say, "one of the dudes are downtown," and that he then knew it was about the shooting of Hernandez. Thompson stated that he left the barbeque with Mondolfi and Anderson and got into the back seat of a gray Saturn driven by Mondolfi. Thompson testified that the Saturn stopped on Fayette Street, that the Lexus pulled up behind it and that he got out and walked to the Lexus to speak with Felton. Felton testified that he was in the Lexus driven by Pope, but that he was extremely intoxicated and fell asleep. Security camera footage from a home on Fayette Street confirmed that the Saturn and the Lexus drove by and stopped on that street.
Video evidence, together with testimony from Pope, Anderson and Thompson,[FN1] established that the Saturn and the Lexus thereafter proceeded to a park, at which point several individuals exited the vehicles. Anderson testified that he got out of the Saturn and, because he was hot, took off the gray sweatshirt that he had worn to the barbeque and placed it on the vehicle. Anderson stated that he thereafter saw defendant, Pope and Thompson walk through the park, with defendant wearing Anderson's gray hooded sweatshirt. Pope and Thompson consistently testified that defendant was wearing a gray hooded sweatshirt and that they followed him through the park to a driveway on Fayette Street. Pope added that defendant was wearing white pants and had the sweatshirt hood pulled "[o]ver his head, strapped down tight." Pope stated that when they reached the driveway, he and Thompson stopped, while defendant kept walking. According to Pope, defendant called out, "yo Ty," and then "packed out, shot once, shot twice, tried to shoot again," but the gun "jammed[, s]o he proceeded to kick" the victim. Pope testified that Thompson left first, then him, then defendant. Anderson testified that Thompson came back "breathing hard" and that he, Mondolfi and Thompson left the park in the Saturn. Pope's account of the shooting was consistent with testimony from Thompson and two other eyewitnesses, a recorded 911 call made by one of those eyewitnesses, security camera footage and physical evidence later found at the scene — namely, two spent shell casings from a 9 millimeter handgun, a bullet fragment and a live 9 millimeter shell casing.[FN2]
Security camera footage demonstrated that, after the shooting, the Lexus and the Saturn returned to the apartment complex where the barbeque was held and that neither defendant nor any of the other passengers were wearing a gray sweatshirt when [*4]they exited their respective vehicles. Pope testified that he thereafter left the apartment complex to pick up his wife and children. Pope's wife testified that she got into the back seat of the Lexus with the baby, while the older child sat up front. She stated that she found a cell phone in the back seat, which she later turned over to the police, but that she did not notice a gray sweatshirt. She asserted that, after Pope told her that "something stupid" had happened, she decided to hide the Lexus at a relative's home in Syracuse. Pope testified that defendant came to retrieve the gray sweatshirt and his phone the day after the shooting and stated, "they said I got him clean." Pope further asserted that defendant told him that he had hidden the gun and asked if it would be "suspect for [him] to leave." Thompson testified that he also spoke with defendant the day after the shooting and that defendant stated that, "if everything goes left, . . . he was going to take the fall." Testimony from an investigator involved in the case established that defendant was subsequently located in Brooklyn and that, while in custody, defendant stated that he knew "[his] name had come up" in a homicide investigation.
The evidence identifying defendant as the shooter was largely, although not entirely, comprised of the testimony of Pope, Anderson and Thompson, each of whom were involved in the incident and had credibility issues stemming from their prior criminal convictions and/or false statements previously given to police about the incident. Thus, had the jury discredited the testimony that defendant was the individual in the gray hooded sweatshirt, a different verdict would not have been unreasonable (see People v Davis, 200 AD3d at 1203; People v Pettus, 160 AD3d 1049, 1050 [3d Dept 2018]). However, the accounts given by Pope, Anderson and Thompson were consistent with one another and were corroborated by video footage of the shooting and their movements before and after, as well as eyewitness testimony, the 911 call and the physical evidence recovered from the scene. Thus, deferring to the jury's credibility determinations, we are satisfied that defendant's convictions for murder in the second degree and criminal possession of a weapon in the second degree are not against the weight of the evidence (see People v Pratcher, 134 AD3d 1522, 1525 [4th Dept 2015], lv denied 27 NY3d 1154 [2016]; People v Walton, 16 AD3d 903, 905 [3d Dept 2005], lv denied 5 NY3d 796 [2005]).
Defendant further argues that County Court should have granted his motion to suppress a statement he made to police while in custody before he was advised of his Miranda rights. The admissibility of a statement made by a defendant in custody turns on whether such statement was "the product of 'express questioning or its functional equivalent'" (People v Bryant, 59 NY2d 786, 788 [1983], quoting Rhode Island v Innis, 446 US 291, 300-301 [1980]; see People v Huffman, 61 NY2d 795, 797 [1984]; People [*5]v George, 127 AD3d 1496, 1497 [3d Dept 2015]). "[S]pontaneous statements made while in custody which are not the product of questioning or its functional equivalent clearly are admissible regardless of whether Miranda warnings were given" (People v Smith, 21 AD3d 587, 588 [3d Dept 2005], lv denied 5 NY3d 833 [2005]; see People v Torres, 21 NY2d 49, 54-55 [1967]; People v Ero, 139 AD3d 1248, 1249 [3d Dept 2016], lv denied 28 NY3d 929 [2016]). A genuinely spontaneous statement is one blurted out without any "inducement, provocation, encouragement or acquiescence, no matter how subtly employed" (People v Maerling, 46 NY2d 289, 302-303 [1978]; see People v Rivers, 56 NY2d 476, 479 [1982]). The dispositive inquiry is whether, under the circumstances, the police officer "should have known that his [or her] statement was 'reasonably likely to evoke an incriminating response from the [defendant]'" (People v Huffman, 61 NY2d at 797, quoting Rhode Island v Innis, 446 US at 301; see People v Paulman, 5 NY3d 122, 129 [2005]; People v Rivers, 56 NY2d at 480).
It is undisputed that, at the time that defendant made the statement, he was in custody at a precinct in New York City, having been apprehended at an address in Brooklyn. As established by the evidence at the suppression hearing, investigators with the Binghamton Police Department traveled to New York City for the purpose of interviewing defendant. The testimony and video evidence demonstrated that, at the start of the interview, one of the investigators made some introductory remarks, explaining that they were members of the Binghamton Police Department who were investigating a homicide that took place on April 28, 2017. The investigator stated that defendant's name "had come up" during that investigation, at which point defendant declared that he was aware that his name had come up. As demonstrated by the video evidence, defendant made this statement while the investigator was speaking. Upon review of the evidence, we agree with County Court that, under the circumstances, defendant's statement was spontaneous and that the investigator could not have reasonably anticipated that his introductory remarks would elicit an arguably incriminating response; in short, defendant's statement was not the product of express questioning or its functional equivalent (see People v Chambers, 184 AD2d 716, 717 [2d Dept 1992]; People v Bryant, 87 AD2d 873, 874 [2d Dept 1982], affd 59 NY2d 786 [1983]; compare People v Harrison, 162 AD3d 1207, 1211 [3d Dept 2018], lv denied 32 NY3d 1205 [2019]).
Lastly, defendant contends that County Court abused its discretion by — in response to a jury note — permitting the jury to use the "zoom" function on certain video evidence. CPL 310.30 provides that, "[a]t any time during its deliberation, the jury may request the court for further instruction or information
. . . with respect to any . . . matter pertinent to the jury's consideration of the case" and that, "[u]pon such a request[*6], the court must direct that the jury be returned to the courtroom and, after notice to both the [P]eople and counsel for the defendant, and in the presence of defendant, must give such requested information or instruction as [it] deems proper." In this regard, "the court has significant discretion in determining the proper scope and nature of the response" (People v Taylor, 26 NY3d 217, 224 [2015]; accord People v Lee, 183 AD3d 1183, 1188 [3d Dept 2020], lv denied 35 NY3d 1114 [2020]). When reviewing County Court's response to a jury note, this Court "must determine whether [County Court] acted within the bounds of its discretion in fashioning an answer to the jury's inquiry" (People v Taylor, 26 NY3d at 224; see People v Owens, 183 AD3d 1276, 1278 [4th Dept 2020], lv denied 35 NY3d 1068 [2020]).
Here, in responding to a jury note requesting to enlarge the video evidence or to use the "zoom" function on such videos, County Court aptly reasoned that the jury's request was no different than a request to use a magnifying glass to better view physical evidence — a practice that has been deemed permissible (see People v Faulk, 185 AD3d 953, 956 [2d Dept 2020], lv denied 35 NY3d 1112 [2020]; People v Moody, 195 AD2d 1016, 1016-1017 [4th Dept 1993]; compare People v Brown, 277 AD2d 972, 972 [4th Dept 2000], lv denied 96 NY2d 732 [2001]). Thus, we discern no abuse of discretion in County Court's determination to allow the jury to use the "zoom" function on certain video evidence during deliberations (see generally People v Cason, 203 AD3d 1309, 1315 [3d Dept 2022], lv denied 38 NY3d 1132 [2022]; People v Briskin, 125 AD3d 1113, 1121 [3d Dept 2015], lv denied 25 NY3d 1069 [2015]). Furthermore, there is nothing in the record to support defendant's assertions that the jury's use of the "zoom" function somehow altered the video evidence or that the jury used the "zoom" function for an impermissible purpose (see generally People v Brown, 48 NY2d 388, 394 [1979]; compare People v Brown, 277 AD2d at 972).
In the absence of any basis upon which to disturb the judgment of conviction, we affirm. To the extent that we have not expressly addressed any of defendant's contentions, they have been examined and found to be without merit.
Egan Jr., J.P., Pritzker, Reynolds Fitzgerald and McShan, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Mondolfi did not testify. The People presented evidence of their extensive, but ultimately unsuccessful, efforts to locate and produce him for trial.

Footnote 2: Testimony established that, although attempted, no fingerprint or DNA evidence was extracted from any of the shell casings.