People v Cokely
2026 NY Slip Op 03030
May 14, 2026
Appellate Division, Third Department
Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.
This decision is uncorrected and subject to revision before publication in the Official Reports.

The People of the State of New York, Respondent,
v
Darius Cokely, Appellant.

Decided and Entered:May 14, 2026
CR-24-1005
Calendar Date: March 23, 2026
Before: Clark, J.P., Ceresia, Fisher, Powers And Corcoran, JJ.

Rosenberg Law Firm, Brooklyn (Samantha L. Imber of counsel), for appellant.
Angela Kelley, Special Prosecutor, East Greenbush, for respondent.

[*1]
Clark, J.P.
Appeal from a judgment of the County Court of Albany County (Andra Ackerman, J.), rendered February 1, 2023, upon a verdict convicting defendant of the crime of murder in the second degree.
On March 18, 2020, a large group of young adults were involved in a fight on Madison Avenue in the City of Albany. The victim was stabbed in the chest during the ordeal and he succumbed to his injuries. Defendant was ultimately arrested and charged with murder in the second degree in connection with the stabbing. During pretrial proceedings, defendant filed a motion seeking, among other things, suppression of evidence that witnesses had chosen his picture from police-generated photo arrays in connection with the fight, arguing that his identification was the product of unduly suggestive pretrial identification procedures. County Court denied defendant's motion following a hearing, finding, as relevant here, that "the photographic identification procedures conducted by law enforcement were fundamentally fair and without any suggestiveness." Following a jury trial, defendant was convicted as charged and sentenced to a prison term of 25 years to life. Defendant appeals.
Defendant contends that the verdict is not supported by legally sufficient evidence and is against the weight of the evidence, arguing that the People did not prove his identity as the perpetrator of the stabbing. We disagree. "When assessing the legal sufficiency of a jury verdict, we view the facts in the light most favorable to the People and examine whether there is a valid line of reasoning and permissible inferences from which a rational jury could have found the elements of the crime proved beyond a reasonable doubt" (People v Harris, 246 AD3d 1293, 1294 [3d Dept 2026] [internal quotation marks and citations omitted]; see People v Bleakley, 69 NY2d 490, 495 [1987]). In contrast, when conducting a weight of the evidence review, we "view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Warr, 237 AD3d 1262, 1263 [3d Dept 2025] [internal quotation marks and citations omitted], lv denied 43 NY3d 1059 [2025]; see People v Sanchez, 32 NY3d 1021, 1023 [2018]; People v Bleakley, 69 NY2d at 495). Where a case is premised solely upon circumstantial evidence, we must be satisfied that "the inference of [the defendant's] guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence" (People v Baque, 43 NY3d 26, 30 [2024] [internal quotation marks and citation omitted]).FN1
As relevant here, a person is guilty of murder in the second degree when, "[w]ith intent to cause the death of another person[*2], he [or she] causes the death of such person" (Penal Law § 125.25 [1]). "A person acts intentionally with respect to a result . . . when his [or her] conscious objective is to cause such result" (Penal Law § 15.05 [1]). "Finally, as an implicit but necessary element of each and every crime, the People must prove beyond a reasonable doubt the identity of the defendant as the person who committed the crime" (People v Moore, 247 AD3d 1251, 1253 [3d Dept 2026] [internal quotation marks and citations omitted]).
The trial evidence established that a large fight broke out on Madison Avenue in the City of Albany on the afternoon of March 18, 2020. The fight started in response to an offensive comment the victim's cousin had made on a Facebook post and upwards of 10 young adults were involved in the ordeal, including both men and women alike. The victim was stabbed in the chest during the fight and later died from blood loss resulting from a puncture wound to his heart. The trial witnesses confirmed that defendant was among the group fighting on the date in question and identified him on video footage as the person wearing orange sneakers, a gray sweatshirt and white gloves during the event.
The People presented both testimonial and video evidence to support their theory that defendant was the perpetrator of the stabbing. As for the testimonial evidence, the victim's aunt and cousin both testified that they had seen the victim get into an altercation with defendant in an alleyway next to the victim's apartment at some point during the ordeal. The aunt further explained that she observed defendant keep his left hand in his pants pocket while he was fighting with the victim in the alleyway and heard defendant state that he was going to kill the victim several times. The aunt ended up pushing defendant at one point during the fight and testified that she felt "something hard" in his pants pocket when she did so. Both the cousin and aunt revealed that, after the victim got into an altercation with defendant in the alleyway, the victim thereafter ran out of the alleyway and began fighting with a different individual, referred to as Ozone, on the sidewalk. Although neither the cousin nor the aunt observed the victim get stabbed during the fight, at some point after they witnessed him fighting with defendant and Ozone, they saw that he was bleeding. After the victim was helped to the ground, his grandmother observed a stab wound to his chest and called 911.
After the victim was transported to the hospital, police found his hairbrush lying in the street next to droplets of blood. The hairbrush and blood were located near a black Mazda that was parked in front of the victim's building. Given the location where the hairbrush and blood were found, the People proffered a theory that the victim had been stabbed when he was fighting near the black Mazda and that defendant was the perpetrator, relying on video evidence to support such theory. In that regard, the People [*3]played for the jury a compilation of video footage obtained from traffic cameras and cell phones, which captured the fight from different vantage points. The video footage showed that, before the victim ran out of the alleyway and began fighting with Ozone as described by the aunt and cousin, defendant paced outside of the alleyway with his hand in his pants pocket and thereafter walked to the street side of the black Mazda while a large group of individuals fought on the sidewalk. A little while later, the video footage showed Ozone fighting a male with his bare hands on the sidewalk near the front of the Mazda and the victim then ran out of the alleyway toward Ozone, punching him in the face near the front of the vehicle and then wrestling with him toward the back of it. Significantly, video footage from a different vantage point across the street showed that, when the victim charged Ozone with his fist raised near the front of the Mazda, a person with white gloves and orange sneakers on — i.e., the clothing defendant was identified as wearing during the fight — was leaning against the hood of the Mazda appearing to grip an object in his left hand and thereafter lunged toward the victim and Ozone as they passed in front of the vehicle. After lunging at the victim and Ozone, another video captured defendant skipping backwards toward the back of the Mazda appearing to fumble something in his hands. The victim thereafter continued to fight with Ozone and other individuals and, a little while later, got into a physical altercation with defendant near a parked Ford SUV. As shown in the video footage, an object appears to fall to the ground when the victim and defendant were fighting near the Ford. At some point thereafter, witnesses realized that the victim was bleeding and the group dispersed.
A witness who had driven defendant to the fight testified that, after the group became aware that the victim was bleeding, she and others got into her car, the black Ford SUV near where the victim and defendant had been fighting, to leave. Before doing so, however, she heard someone say to pick up a knife, and she retrieved a closed pocketknife from the street in the vicinity of the Ford. Although this witness did not know who had asked her to pick up the knife, she confirmed that the directive came from a "male voice" who was already inside of the vehicle. Notably, the video evidence shows that defendant had gotten in the vehicle before this witness. This witness did not observe any blood on the pocketknife she retrieved from the street; however, a blood stain was found on the driver's side door panel of her vehicle and forensic testing confirmed that the blood matched the victim's DNA profile. At trial, this witness maintained that she had gotten the victim's blood on her arm during the fight.
In addition to the foregoing, the People also presented evidence of defendant's conduct after the fight, which may have been indicative of his consciousness of guilt[*4]. To that end, evidence showed that defendant either reactivated or deactivated one of his Facebook accounts within 22 minutes of the victim's stabbing, fled to New York City a day later,FN2 and wrote a Facebook message to a friend in the subsequent weeks in which he stated that he could not use his regular cell phone "right now." Police thereafter obtained a warrant to search defendant's home and, upon executing the warrant, found a gray sweatshirt hanging on a closet door and a blue pocketknife in the garage. The knife was sent for forensic testing, but no fingerprints were identified on it and the DNA obtained from the blade and handle was insufficient for comparison.
As for the medical evidence presented in this case, the proof demonstrated that the victim sustained a single stab wound to the right atrium of his heart. A forensic pathologist who conducted the victim's autopsy testified that the victim's stab wound had likely been inflicted by an object with a pointed end and at least one smooth edge, and that the wound was consistent with the object having been inserted horizontally while the victim was moving. The forensic pathologist confirmed that the victim could have continued moving around for "at least a low number of minutes" after being stabbed, and, although blood would not have "pour[ed]" from the wound, the victim would have emitted "several drops" of blood.
Viewing the foregoing evidence in the light most favorable to the People, we conclude that there "is a valid line of reasoning and permissible inferences from which a rational jury" could conclude beyond a reasonable doubt that defendant was guilty of murder in the second degree (People v Harris, 246 AD3d at 1294 [internal quotation marks and citations omitted]; see generally People v Lendof-Gonzalez, 36 NY3d 87, 91-92 [2020]). To that end, the trial evidence established that the victim died from a puncture wound to the heart, sustained during a fight in which defendant was a participant, and that he died from his injury. The medical testimony, in turn, confirmed that the victim's injury was consistent with a stab wound from a pointed object, permitting a reasonable inference that the victim had been stabbed in the chest with the pocketknife that was subsequently retrieved from the scene. As for the proof supporting the People's theory that defendant was the perpetrator, although the faces of the individuals involved in the fight were difficult to see on the video footage, the People elicited evidence that defendant was wearing distinctive orange sneakers and white gloves on the date of the incident, permitting an inference that defendant was the individual shown on the videos wearing such distinctive clothing. In that regard, the video evidence showed defendant pacing with his hand in his pocket at certain points during the fight and the victim's aunt recalled feeling a "hard" object in that area when she pushed defendant during his altercation with the victim in the alleyway[*5]. Defendant was also heard threatening to kill the victim several times during their altercation in the alleyway. Such proof, coupled with the video evidence appearing to show an object in defendant's hands at certain points during the fight, including when he lunged in the direction of the victim and Ozone near an area where blood stains were later found in the street, is legally sufficient to support the jury's finding that defendant is the person who stabbed the victim and that he intended to cause the victim's death in doing so (see People v Dillon, 231 AD3d 1352, 1354 [3d Dept 2024]; People v Green, 190 AD3d 1094, 1096 [3d Dept 2021], lv denied 36 NY3d 1097 [2021]).
Turning to the weight of the evidence, a different verdict would not have been unreasonable insofar as there were no witnesses to the stabbing, the video footage did not definitively depict the event, and there was no forensic evidence linking the knife found at defendant's residence to the victim. Defense counsel also elicited an admission from the victim's aunt that she had initially told police that Ozone looked like he had something in his hand when he arrived at the fight. However, when "viewing the evidence presented at trial in a neutral light, and weighing the relative probative force of the conflicting testimony and evidence, as well as the relative strength of the conflicting inferences to be drawn therefrom," we are satisfied that the jury could conclude beyond a reasonable doubt that defendant was the perpetrator (People v Sanchez, 32 NY3d at 1022 [internal quotation marks, ellipsis and citation omitted]; see People v Bleakley, 69 NY2d at 495). Given that the victim's hairbrush and blood droplets were found in the roadway near a black Mazda, the jury could reasonably infer that the stabbing occurred in the vicinity of the Mazda at some point in time between when the victim ran out of the alleyway and when he began fighting in the street near the Mazda. The video evidence showed only three people in close proximity to the victim when he ran out of the alleyway toward the black Mazda — i.e., Ozone, defendant and a person referred to as Giggetts. As can be seen in such footage, Ozone was fighting with bare hands immediately before the victim charged him in front of the Mazda, and Giggetts was standing apart from the victim at that time and then engaged a different person in a fight. Defendant, by contrast, was leaning against the hood of the Mazda as the victim fought with Ozone in front of the vehicle and he appeared to have an object in his left hand at the time. The video footage then showed defendant lunge in the direction of the victim and Ozone as they were fighting in front of the Mazda, doing so in a manner that was consistent with the medical evidence. Giving due deference to the jury's credibility determinations, when considering the video evidence in conjunction with the aunt's testimony about feeling a hard object in defendant's pants during the fight and hearing [*6]him state that he was going to kill the victim, along with defendant's suspicious conduct after the incident, we are satisfied that the inference of defendant's guilt "is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence" (People v Baque, 43 NY3d at 30 [internal quotation marks and citation omitted]). Accordingly, we conclude that the People proved defendant's identity as the perpetrator of the victim's stabbing beyond a reasonable doubt and that the verdict is not against the weight of the evidence (see People v Butts, 244 AD3d 1479, 1484 [3d Dept 2025], lv denied 45 NY3d 944 [2026]; People v Grady, 233 AD3d 1369, 1372 [3d Dept 2024], lv denied 43 NY3d 963 [2025]; People v Wilson, 230 AD3d 448, 449 [1st Dept 2024]; People v Stanford, 130 AD3d 1306, 1307-1308 [3d Dept 2015], lv denied 26 NY3d 1043 [2015]; People v Green, 121 AD3d 1294, 1294-1295 [3d Dept 2014], lv denied 25 NY3d 1164 [2015]).
Next, defendant argues that County Court erred in denying his motion to suppress the results of the police-generated photo arrays conducted during the ensuing investigation. "[U]nduly suggestive pretrial identification procedures violate due process and therefore are not admissible [at trial] to determine the guilt or innocence of an accused" (People v Chipp, 75 NY2d 327, 335 [1990], cert denied 498 US 833 [1990], citing United States v Wade, 388 US 218, 229-230 [1967]; see People v Wright, 42 NY3d 708, 724 [2024]). On a motion to suppress the results of a police-generated photo array, "[t]he People must initially establish that the police conduct was reasonable and that the photo array lacks any undue suggestiveness " (People v Lewis, 224 AD3d 1143, 1150 [3d Dept 2024] [internal quotation marks and citations omitted], lv denied 42 NY3d 939 [2024]; see People v Hawkins, 167 AD3d 1071, 1072 [3d Dept 2018]). While the People bear the initial burden in that regard, "the defendant [has] the ultimate burden of proving that the pretrial identification procedure was unduly suggestive" (People v Lewis, 224 AD3d at 1150 [internal quotation marks and citations omitted]; see People v Chipp, 75 NY2d at 335; People v Salahuddin, 211 AD3d 1323, 1325 [3d Dept 2022], lv denied 39 NY3d 1113 [2023]). "A photo array is unduly suggestive if some feature or characteristic of one of the depicted individuals or photographs is so unique or distinctive that it draws the viewer's attention to that photograph, thereby indicating that the police have selected that particular individual. While the individuals depicted in a photo array do not need to be nearly identical to the defendant, their characteristics must be sufficiently similar to those of the defendant, so as to not create a substantial likelihood that the defendant would be singled out for identification" (People v Lewis, 224 AD3d at 1150 [internal quotation marks and citations omitted]; see People v Perkins, 28 [*7]NY3d 432, 437 [2016]). "Upon review, the findings of the suppression court [in this regard] are entitled to great weight" (People v Dowling, 207 AD3d 799, 800 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 939 [2022]).
The evidence at the suppressionhearing established that, during the investigation into the victim's stabbing, law enforcement showed different photo arrays to seven witnesses in connection with the event. The arrays were made up of six pictures, each of which depicted a young male of the same race as defendant with similar length hair and facial hair. Defendant's picture was included in each array and was placed in different locations. Each photograph also had an identical black box near the bottom of the subjects' necks to cover any identifying clothing features or tattoos. Upon being shown the photo arrays, each witness independently chose defendant's picture as a person they recognized in connection with the fight. The police witnesses who testified during the hearing confirmed that the photo arrays were administered in a double-blind fashion so that the detectives who administered the arrays did not know the identity of the suspect before doing so. Before showing the witnesses the arrays, detectives read from a pre-printed form that advised that "[t]he individual may or may not be among the photos" and that the "[p]hotographs ma[y] not depict the true complexion of a person[, which] may be lighter or darker than shown in the photos." The form also directed the witnesses to "[p]ay no attention to any markings on the photos or difference in photo style or type."
On this record, the People established the reasonableness of the identification procedures utilized by law enforcement through the testimony about the double-blind procedure used to administer the photo arrays (see CPL 60.25 [1] [c]) and the other methods employed to mitigate any suggestiveness.FN3 We are unpersuaded by defendant's argument that the photo arrays were unduly suggestive because his photograph was the only one with a light background. Although the background of defendant's picture was slightly lighter in comparison with the other pictures, each picture depicted men of the same race with similar length hair and facial hair, they were taken "from approximately the same distance," and they were cropped in a manner that rendered any height comparisons impossible (People v Marryshow, 162 AD3d 1313, 1314 [3d Dept 2018]; see People v Lowe, 237 AD3d 1225, 1226-1227 [2d Dept 2025], lv denied 43 NY3d 1056 [2025]). Upon closely examining the photo arrays, we are satisfied that the slight variation in the background lighting was "not so distinctive that it would have drawn the viewer's attention to [defendant's] photograph . . . so as to create a substantial likelihood that he would be singled out for identification" (People v Marryshow, 162 AD3d at 1315; see People v Lowe, 237 AD3d at 1226-1227; People v Evans, 137 AD3d 1683, 1683 [[*8]4th Dept 2016], lv denied 27 NY3d 1131 [2016]).
Under the circumstances of this case, County Court also did not abuse its discretion in the manner in which it resolved the People's pretrial motion to preclude defendant from cross-examining police witnesses about prior instances of misconduct that had been deemed "unfounded," "exonerated," or "not sustained." Prior to trial, the People disclosed to defendant materials pertaining to "all citizen complaints and administrative investigations" contained within the personnel files of the law enforcement witnesses they intended to call at trial. The People thereafter filed a motion in limine seeking to preclude defendant from cross-examining such law enforcement witnesses about misconduct allegations that were deemed "exonerated, unfounded, not sustained, or closed due to failure by the complainant to communicate with internal affairs," arguing that mere unsubstantiated accusations of wrongdoing were irrelevant and improper for cross-examination purposes. Defense counsel did not file opposition papers in response to such motion. However, during a pretrial conference, defense counsel orally confirmed that he had received the motion and broadly stated that "if [he] ha[d] a good faith basis to ask the question, with the report being made, [he] should be allowed to cross-examine" within "the boundaries of propriety." County Court, in response, stated that it was "going to clarify the boundaries" and granted the People's preclusion motion "with respect to those matters determined to be exonerated, unfounded, not sustained, or closed due to failure by the complainant to communicate with internal affairs within their personnel files."
Initially, contrary to the People's contention, defendant's challenge to County Court's ruling in this regard is properly preserved for appellate review insofar as defense counsel orally opposed the People's motion during pretrial proceedings (see CPL 470.05 [2]).FN4 Moreover, to the extent the People suggest that there is an absolute bar on cross-examining law enforcement officers about accusations of misconduct that have not resulted in an administrative sanction or criminal prosecution, such contention is incorrect (see e.g. People v Rouse, 34 NY3d 269, 276-277 [2019]; People v Enoe, 144 AD3d 1052, 1054 [2d Dept 2016]). Nonetheless, County Court providently exercised its discretion in granting the People's preclusion motion in the context of this case. Although "misconduct allegations against law enforcement officers, when relevant to a witness's credibility, are properly the subject of cross-examination for impeachment purposes" (People v Fuentes, ___ NY3d ___, ___, 2025 NY Slip Op 05872, *3 [2025]; see People v Rouse, 34 NY3d at 276; People v Smith, 27 NY3d 652, 662 [2016]), counsel must have a good faith basis for inquiring and identify "specific allegations that are relevant to the credibility of the law enforcement witness[es]" (People v Smith, 27 NY3d at 662). Here, although [*9]defense counsel broadly objected to the People's preclusion motion, he did not make an offer of proof articulating a good faith basis for inquiring and identifying specific allegations of misconduct that he sought to cross-examine the law enforcement witnesses about (see People v Smith, 171 AD3d 523, 524 [1st Dept 2019], lv denied 33 NY3d 1073 [2019]; People v Cepeda, 158 AD3d 468, 469 [1st Dept 2018], lv denied 31 NY3d 1080 [2018]; compare People v Rouse, 34 NY3d at 276-277; People v Smith, 27 NY3d at 663-664, 667; People v Randolph, 204 AD2d 359, 360-361 [2d Dept 1994]). In the absence of an offer of proof in response to the People's motion, there is no basis to disturb County Court's evidentiary ruling in this regard.FN5
Nor did County Court err in instructing the jury on the expanded definition of intent in response to a note submitted during deliberations. "It is well established that a trial court's core responsibility upon receiving a substantive jury inquiry during deliberations in a criminal trial is to provide counsel with meaningful notice of the note's specific content and to give the jury a meaningful response" (People v Cason, 203 AD3d 1309, 1314 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 38 NY3d 1132 [2022]; see CPL 310.30; People v O'Rama, 78 NY2d 270, 276-277 [1991]).
In doing so, the court retains "significant discretion in determining the proper scope and nature of the response" (People v Taylor, 26 NY3d 217, 224 [2015]; see People v Rawlinson, 170 AD3d 1425, 1429 [3d Dept 2019], lv denied 33 NY3d 1107 [2019]). Whether a response is meaningful depends upon "the form of the jury's question, which may have to be clarified before it can be answered, the particular issue of which inquiry is made, the supplemental instruction actually given and the presence or absence of prejudice to the defendant" (People v Malloy, 55 NY2d 296, 302 [1982], cert denied 459 US 847 [1982]; see People v Taylor, 26 NY3d at 224). As relevant here, "when the original instruction is accurate and where the jury expresses no confusion regarding the original charge, a simple reiteration of the original instruction suffices as a meaningful response" (People v Santi, 3 NY3d 234, 248 [2004] [internal quotation marks, brackets and citation omitted]; see People v Goff, 224 AD3d 1008, 1010 [3d Dept 2024]).
During the charge conference prior to the start of deliberations, the People requested that County Court instruct the jury on the expanded definition of intent and defense counsel consented to proceeding in that manner. As a result, in addition to defining intent to mean, in the context of this case, that defendant acted with the "conscious objective or purpose . . . to cause the death of another," the court also read the expanded charge as set forth in the Criminal Jury Instructions (see CJI2d[NY] Expanded Charge on Intent, https://www.nycourts.gov/judges/cji/1-General/CJI2d.Intent.pdf [last accessed Mar. 31, 2026]). During deliberations[*10], the jury submitted a note to County Court requesting "a copy of the definitions of the charge[ ] and components, such as intent." The court read the note in front of the prosecutor, defendant and defense counsel, and advised that it would instruct the jury on the required elements of murder in the second degree, including the expanded definition of intent. Defense counsel objected to reading the expanded definition of intent, instead advocating for a response that utilized the more generalized definition of intent as set forth in Penal Law § 15.05. Noting that it had originally charged the jury with the expanded definition of intent, the court denied defendant's request and read the expanded definition to the jury.
Defendant argues that re-reading the expanded charge on intent in response to the jury's note prejudicially led the jury to focus on the mens rea element of murder in the second degree to the exclusion of the issue of identity. However, intent was an essential element of the murder charge and the jury specifically asked for a definition of such term in its note submitted during deliberations. Given that the original instructions provided by County Court accurately conveyed the expanded charge on intent and the jury did not express any confusion in that regard, we are satisfied that the "simple reiteration of the original instruction suffice[d] as a meaningful response" to the jury's note (People v Santi, 3 NY3d at 248 [internal quotation marks and citation omitted]; see People v Cason, 203 AD3d at 1315).
We are also unpersuaded by defendant's contention that his trial counsel rendered ineffective assistance in this case. In that regard, defendant first argues that counsel was ineffective for failing to object to the admission of five video timelines generated from cell phone footage capturing the fight. The video timelines utilized certain forensic clarifications to make the footage more easily viewable, including freeze-frame effects, scaling effects and motion effects. Relatedly, defendant takes issue with counsel's failure to object to the admission of a compilation video generated from a combination of traffic camera footage, bus camera footage and cell phone footage that tracked his movements during the fight. He argues that the admission of the video timelines and the compilation footage was prejudicial insofar as they "lead the jury to the prosecution's desired conclusion by viewing the evidence the way the People wanted the jury to view it."FN6 However, the analyst and the detective who generated the video timelines and compilation footage explained the process by which they did so, confirmed that such footage accurately reflected what was on the raw footage, and revealed that the visual effects generated "merely highlighted portions of the video[s] rather than change[ ] [their] substance" (People v Stewart, 241 AD3d 1179, 1181 [1st Dept 2025] [internal quotation marks and citation omitted], lv denied 45 NY3d 939 [2026]; see [*11]People v Yanez, 180 AD3d 816, 816-817 [2d Dept 2020], lv denied 38 NY3d 931 [2022]; see also People v Ashe, 208 AD3d 1500, 1507 [3d Dept 2022], lv denied 39 NY3d 961 [2022]; People v Wemette, 285 AD2d 729, 730 [3d Dept 2001], lv denied 97 NY2d 689 [2001]). As an objection to the admission of such video evidence would have had little chance of success in these circumstances, counsel did not render ineffective assistance in declining to make one (see People v Mowry, 246 AD3d 1288, 1293 [3d Dept 2026]; People v Prusinski, 242 AD3d 1427, 1433 [3d Dept 2025], lv denied 45 NY3d 938 [2026]).
Defendant also contends that counsel was ineffective for failing to object to the manner in which the prosecutor characterized the video evidence on summation, arguing that the prosecutor improperly told the jury what the video footage depicted. In that regard, during the People's summation, the prosecutor showed the jurors a PowerPoint presentation that had a video compilation of footage from the fight. When showing the PowerPoint presentation to the jury, the prosecutor emphasized certain defining features of the video footage linking defendant to the stabbing, including that a curved object, "a knife," could be seen in defendant's hands when he was standing near the victim. "There is no inherent problem with the use of a PowerPoint presentation as a visual aid in connection with closing arguments" (People v Williams, 29 NY3d 84, 89 [2017]), so long as the prosecutor's statements in connection therewith and any "added captions or markings are consistent with the trial evidence and the fair inferences to be drawn from that evidence" (People v Anderson, 29 NY3d 69, 72 [2017], cert denied 583 US 977 [2017]). Here, the prosecutor's statements in connection with the presentation constituted fair commentary on the evidence and the reasonable inferences to be drawn therefrom, and also fairly responded to the assertions made in defense counsel's summation, which had attacked the probative value of the video footage on the ground that it did not clearly depict the underlying incident (see People v Meyers, 233 AD3d 1266, 1268 [3d Dept 2024], lv denied 43 NY3d 931 [2025]; People v Karnes, 223 AD3d 1119, 1123 [3d Dept 2024], lv denied 42 NY3d 928 [2024]). As the People stayed within the bounds of a permissible closing argument, defense counsel's failure to object to the challenged statements did not amount to ineffective assistance (see People v Rudge, 185 AD3d 1214, 1217 [3d Dept 2020], lv denied 35 NY3d 1070 [2020]).
Defendant's final claim of ineffective assistance of counsel focuses on counsel's failure to ask County Court to instruct the jury that, in the context of this circumstantial evidence case, the People were required to prove his guilt to a moral certainty. However, County Court gave a circumstantial evidence charge in a manner consistent with the language set forth in the pattern jury instructions (see CJI2d[NY] Circumstantial Evidence, https://www.nycourts.gov[*12]/judges/cji/1-General/CJI2d.Circumstantial_
Evidence.pdf [last accessed Mar. 31, 2026]), and the "moral certainty" language that defendant urges should have been included in the charge is not required (see People v Ford, 66 NY2d 428, 441 [1985]; People v Sanchez, 61 NY2d 1022, 1024 [1984]). When viewed in totality, we conclude that defense counsel provided meaningful representation in this case (see People v Benevento, 91 NY2d 708, 712 [1998]).
Finally, we deny defendant's request to reduce the sentence in the interest of justice. Although we recognize that the underlying offense marks defendant's first criminal conviction, that he was only 20 years old at the time of the crime, and that a shorter sentence was offered during plea negotiations, when considering the violent and serious nature of the offense, we do not find the sentence imposed after trial to be unduly harsh or severe (see CPL 470.15 [6] [b]; see generally People v Brisman, 43 NY3d 322, 324 [2025]). Defendant's remaining contentions, to the extent not expressly addressed herein, have been considered and found lacking in merit.
Ceresia, Fisher, Powers and Corcoran, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1
Although there was video evidence depicting the fight, the jury was required to make a series of inferences to conclude from the footage that defendant was the perpetrator of the victim's stabbing and resulting death (see People v Exford, 234 AD3d 1252, 1254 [4th Dept 2025]; compare People v Hardy, 26 NY3d 245, 250 [2015]; People v Griffin, 203 AD3d 1608, 1611 [4th Dept 2022], lv denied 38 NY3d 1008 [2022]). A circumstantial evidence charge was given in this case and the People conceded during oral argument before this Court that the underlying prosecution hinged upon circumstantial evidence.

Footnote 2
The testimony established that, two days after the fight, Ozone was arrested in North Carolina on unrelated charges.

Footnote 3
Defendant argues that the arrays were not actually administered in a double-blind fashion, highlighting testimony indicating that defendant's name was provided to certain of the identifying witnesses during the administration of the arrays. However, the record makes clear that this occurred only after the witnesses had already identified defendant's picture in connection with the fight.

Footnote 4
That said, defendant's contention that County Court's ruling violated his Sixth Amendment right of confrontation is unpreserved, as his counsel did not make such argument to the court when orally opposing the People's motion (see People v Davis, 200 AD3d 1200, 1203 [3d Dept 2021]).

Footnote 5
We recognize that "defense counsel [is] not required to make a proffer [in this regard] prior to trial" and can instead wait "to question [law enforcement witnesses] on cross examination" and then make the requisite "showing of relevance and good faith" upon any objection by the People (People v Smith, 27 NY3d at 663 n 2). However, under the procedural posture in which this issue was presented — i.e., in a pretrial preclusion motion brought by the People — County Court did not abuse its discretion in granting the People's motion in the absence of an offer of proof by defense counsel in response.

Footnote 6
Defendant does not argue that the footage was improperly authenticated.